SIXTH DIVISION
December 7, 2007

No. 1-06-0798

CAMBRIDGE ENGINEERING, INC.,          )          Appeal from the
                                       )          Circuit Court of
                Plaintiff-Appellant,   )          Cook County, Illinois.
                                       )
                                       )
                                       )          No. 01 L 14713
v.                                     )
                                       )
MERCURY PARTNERS 90 BI, INC.,          )          Honorable
d/b/a Brucker Company,                 )          Stuart A. Nudelman
                                       )          Judge Presiding.
                Defendant-Appellee.    )

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This is a suit for attorney fees and punitive damages incurred in seeking legal enforcement of a contractual covenant not to compete. In a prior action filed in Missouri in 2001, plaintiff-appellant, Cambridge Engineering, Inc. (Cambridge), prevailed in a suit to enjoin former employee Gregory Deger from engaging in certain sales-related activities for his new employer, Mercury Partners 90 BI, Inc., d/b/a Brucker Company (Brucker). Thereupon, Cambridge filed the instant lawsuit against the employer Brucker, seeking compensatory and punitive damages against Brucker for tortious interference with contract; those damages included recovery of the fees it expended in the Missouri injunction action against Deger. Prior to trial, the parties stipulated to limit the claim for compensatory damages solely to attorney fees, but let the action for punitive damages stand. The trial court directed a verdict against Cambridge on its claim for punitive damages, and it entered judgment notwithstanding the verdict (judgment *n.o.v.*) against

No. 1-06-0798

Cambridge on the issue of liability. Cambridge now appeals both the judgment *n.o.v.* with respect to its right to recover fees and the directed verdict with respect to punitive damages. For the reasons that follow, we affirm.

I. BACKGROUND

On March 27, 2002, Cambridge filed its first amended complaint against Brucker, in which it sought damages for tortious interference with contract. The complaint alleges that Cambridge is a Missouri corporation, engaged in the business of manufacturing and selling commercial and industrial gas direct fired space heating and make-up air heating equipment; Brucker is an Illinois corporation that serves as a manufacturers' representative and wholesaler of heating, ventilation, and air conditioning equipment and competes with Cambridge in the Midwest region.

Beginning in 1996, Cambridge employed Deger as a sales representative in northern Illinois and Indiana. His employment agreement contained both noncompetition and nonsolicitation covenants. On April 21, 2001, Cambridge terminated Deger's employment for good cause. Subsequently, on or before June 29, 2001, Brucker allegedly hired Deger to compete with Cambridge and to solicit Cambridge's customers, in violation of the restrictive covenants in his contract with Cambridge.

Cambridge further avers that during Deger's interviews for employment with Brucker, Deger told Brucker's president David Sobut that his contract with Cambridge had contained a noncompetition clause. In addition, upon learning of Deger's employment with Brucker, Cambridge sent a letter to Brucker informing it of the restrictive covenants in Deger's contract

No. 1-06-0798

and demanded that Deger cease all competitive activities. Nevertheless, Brucker continued to employ Deger, and it "intentionally and without justification" assisted Deger in violating the restrictive covenants so that it could gain a competitive advantage against Cambridge.

As a result of this conduct, Cambridge sought injunctive enforcement of the restrictive covenants in the circuit court of St. Louis County, Missouri (the St. Louis court). On October 11, 2001, the St. Louis court permanently enjoined Deger from taking any action that would violate the restrictive covenants in his employment contract with Cambridge.

A copy of the employment agreement between Deger and Cambridge is attached to the complaint as Exhibit A. It has several provisions that are relevant to the case at hand. Section 7, entitled "Post-Termination Protection of Employer's Confidential Information and Business Interests," contains the restrictive covenants that Deger allegedly violated:

"c. * * * Employee shall not, for a period of 24 months following the termination of his/her employment, whether as principal, employee, independent contractor or otherwise, in any way, directly or indirectly, engage in any activity for or on behalf of Employer's competitors, or engage in any business that competes with Employer, anywhere in the United States or Canada.

d. Employee shall not, for the same period, either directly or indirectly, contact or communicate with any customer, employee or representative of Employer for any purpose that is or may be detrimental to Employer, including without limitation, to engage in sales activities, employment recruitment, or solicitation of any kind."

In addition, section 9(d) contains a choice of law provision:

"This agreement * * * and the entire relationship of the parties, shall be governed by the laws of the State of Missouri."

Finally, section 9(e) provides for judicial reformation of the agreement when necessary:

"This Agreement shall be interpreted to give the fullest effect to its provisions consistent with controlling law. If any term or provision shall be deemed invalid or unenforceable by a court of competent jurisdiction, then such term of provision shall be automatically amended to be effective to the fullest extent permitted by law, and the adjudicating court shall have authority to modify any such term or provision to accomplish said purpose and intention. The remainder of this agreement shall continue in full force and effect as if such modification had always been part of the Agreement."

Also attached to the complaint as Exhibit B is the final injunction issued by the St. Louis court against Deger. The caption of the case is "Cambridge Engineering, Inc. v. Greg Deger"; Brucker is not a named party. In handing down the injunction against Deger, the court found the restrictive covenants in the employment agreement to be valid, stating: "Cambridge has a protectable interest in its customers underlying the restrictive covenants. Deger's employment with Brucker and his admitted solicitation of Cambridge customers violates the restrictive covenants. The geographic and temporal scope of the restrictive covenants is reasonable."

In its answer to the complaint, Brucker admits that it hired Deger, but it denies that Deger was competing with Cambridge or soliciting Cambridge customers on behalf of Cambridge's competitors. Brucker also avers that Deger told Brucker that he had been terminated without cause and that Deger's statement was supported by the State of Illinois Department of

Employment Security Appeals Referee's Decision (Referee's Decision) regarding Deger's unemployment benefits. In addition, Deger's attorney gave Brucker a court case (Showe-Time Video Rentals, Inc. v. Douglas) and told Brucker that under the law as described in that case, the restrictive covenant in Deger's contract was unenforceable.

With respect to the St. Louis case, Brucker admits that the St. Louis court entered a permanent injunction against Deger, but it argues that the decision was "strictly against Deger." Upon learning of that order, Brucker fired Deger.

Attached to the answer is a copy of the Referee's Decision. Under the heading "Findings of Fact," the decision states, "He [Deger] was discharged by the employer regarding a disagreement over his employment contract." Later, under the heading "Conclusion," it states, "There was no competent evidence which could establish that the Claimant [Deger] willfully an deliberately violated any company rule or policy of the Employer or that the claimant's actions caused harm to the employer."

Cambridge filed a motion in limine regarding choice of law, requesting that the court apply Missouri substantive law in the case. The court heard arguments from both sides and then found that Illinois substantive law applied, over the objection of Cambridge's counsel. At this time, counsel for Brucker advised the court, in the presence of Cambridge's counsel and with his acquiescence, that with respect to compensatory damages, Cambridge had agreed to limit its recovery to legal fees incurred in prosecuting the St. Louis case.

The case proceeded to a jury trial. The first person whom Cambridge called to testify was Sobut, Brucker's president, as an adverse witness. Sobut told the court that Deger was not a

Brucker salesperson but, rather, an inside support person for outside salespeople. As a result, he was not directly soliciting customers or making sales calls. However, he admitted that as an employee of Brucker, Deger made multiple contacts with customers he used to solicit at Cambridge. Counsel for Cambridge confronted Sobut with a boilerplate letter that Deger had sent to Cambridge customers when he started working with Brucker; in the letter, Deger said, "I'll be glad to provide you with the same conscientious service which you have come to expect from me." The letter contained a list of products sold by Brucker, and Sobut acknowledged that some of them competed with Cambridge products.

On cross-examination by his own counsel, Sobut testified that Brucker and Cambridge were not direct competitors on all their products; indeed, he said that their area of competition, the make-up air industry, was only a "very small" part of Brucker's business. During the time that Deger was employed with Brucker, he did not work within that competitive area. Instead, his work concerned products that, to the best of Sobut's knowledge, Cambridge did not deal in. Therefore, Sobut opined that Deger was not really "competing" with Cambridge.

Cambridge next called its president, Jack Kramer, to the stand. Kramer spoke about the events leading up to the instant lawsuit, explaining that when Cambridge discovered that Deger was working for Brucker, it sued to enforce the restrictive covenants in Deger's contract.

Under cross-examination, Kramer testified that Cambridge did some business in Canada during the relevant time period. However, when asked if he did business in all provinces of Canada, he responded: "No. * * *I am confident we don't in every province, because that's not even a market."

At the close of Cambridge's case, Brucker moved for a directed verdict on three grounds: first, that the noncompetition clause was overbroad and thus void as a matter of law; second, that Cambridge had not proven damages, as it presented no expert testimony to show that its claimed attorney fees were reasonable; and third, that there was insufficient evidence to support Cambridge's claim for punitive damages. The court denied Brucker's first two motions, though it gave no explanation except to state its need to read the case law that Brucker cited with respect to the permissible scope of noncompetition clauses. However, the court chose to deny Cambridge's request for punitive damages. The judge reasoned that Cambridge had not shown Sobut's actions to be so outrageous in nature as to justify such a remedy. After summarizing the actions that Sobut took during the course of his relationship with Deger, the judge concluded, "Mr. Sobut did I believe in all aspects conduct himself in a manner he thought was proper."

Brucker then opened its defense by calling Cambridge president Kramer as an adverse witness. When asked "what [he] sued him [Deger] for," Kramer agreed with counsel's contention that the purpose of the suit was to prevent Deger from holding any job with a competitor, even as a security guard or a public relations person. However, on cross-examination by his own counsel, Kramer said that he did not know the basis for the specific prayer for relief in the St. Louis case.

Also on cross, Kramer gave his explanation for the geographic scope of the restrictive covenants: "We do business nationally," he said, "and so he [Deger] might be involved in a sale that would take place anywhere in the U.S. or Canada or he could relocate." He also stated that Deger had information on Cambridge's technology and pricing strategies that would be consistently applicable throughout the United States and Canada. Counsel for Cambridge then

attempted to elicit testimony about whether such information would be useful in the hands of Cambridge's competitors, but the court sustained Brucker's objection to the line of questioning, saying that Cambridge was merely trying to "relitigate" the issues decided in the St. Louis case.

The next witness that Brucker called was Deger. He said that after his termination from Cambridge, while he was conducting his job search, he discovered that if he refrained from accepting employment with any firm that had any product that competed with Cambridge, it would foreclose a very broad spectrum of jobs in his area of expertise. "I realized I couldn't possibly be excluded from working for all of those employers due to that clause in the employment agreement," he said. Otherwise, he said that he would be prevented from doing the kind of work that he cared about most.

Deger also testified that he never did sales for Brucker: "I was strictly providing support or background information," he said. Under cross-examination, he acknowledged "contact" with Cambridge's customers during his employment with Brucker, but denied any "solicitation."

When asked on direct examination whether Cambridge did any business in Canada, Deger's response was: "Not that I'm aware of." He explained that he knew of no established customers in Canada. However, he said that he once accompanied a Buffalo-based factory representative to Toronto for a one-day business trip, adding, "I know that was the presence of Cambridge in Canada."

Brucker also very briefly called Sobut to the stand, but he did not testify to anything material to this appeal.

Once it had finished presenting its case, Brucker renewed its motion for a directed verdict

based on the alleged unenforceability of the noncompetition clause and Cambridge's failure to prove damages by expert testimony. The court took the motion under advisement, declining to resolve it immediately. Instead it allowed the question of liability to go to the jury, which returned a verdict in favor of Cambridge, awarding it $50,000 in compensatory damages.

Brucker then filed a motion for judgment notwithstanding the verdict. This motion has not been included in the record on appeal, although Cambridge has attached a copy to its brief. The trial court granted Brucker's motion based on its finding that the noncompetition covenant was unreasonable and thus unenforceable as a matter of law:

> "In this Court's opinion, the covenant not to compete was so overly broad as to make it unenforceable in Illinois. *See e.g. Lawrence and Allen, Inc. v. Cambridge Hum. Res. Grp.*, 292 Ill. App. 3d 131 (Ill. App. Ct. 1997). The covenant not to compete covered all of the United States as well as all of Canada; it even covered places where the Plaintiff does not do business. The Plaintiff interpreted it as forbidding Greg Deger from holding any job, even as a janitor, with any of the Plaintiff's competitors."

As this issue was dispositive, the court made no comment on Brucker's argument regarding whether Cambridge had shown that its claimed damages were reasonable.

Cambridge now appeals from the trial court's grant of judgment *n.o.v.*, as well as from the court's directed verdict on the issue of punitive damages.

II. ANALYSIS

Cambridge contends that the trial court erred in entering judgment notwithstanding the verdict in favor of Brucker. It is not disputed on appeal that Deger's actions violated the text of

the noncompetition covenant as written, or that Brucker's actions constituted interference with that contractual provision. The trial court's grant of judgment *n.o.v.* hinges solely upon the unenforceability of that covenant under Illinois law, and it is this legal conclusion which Cambridge now challenges.[1]

In addition to defending the trial court's decision as to the unenforceability of the covenant not to compete, Brucker urges two other key arguments in support of the judgment below: first, that the omission of Brucker's judgment *n.o.v.* motion from the record is fatal to Cambridge's case, and second, that Cambridge failed to prove that its claimed attorney fees were reasonable, as required for recovery under Illinois law.

In reviewing the lower court's decision to grant judgment *n.o.v.* for Brucker, we apply a *de novo* standard of review. *Reynolds v. Menard, Inc.*, 365 Ill. App. 3d 812, 818, 850 N.E.2d 831, 835 (2006). Judgment notwithstanding the verdict is only warranted when " ' "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." ' " *Reynolds*, 365 Ill. App. 3d at 818, 850 N.E.2d at 835, quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 453, 603

---

[1] Although the enforceability of the covenant not to compete was substantively decided in the St. Louis case, only the employee, Deger, and not the employer, Brucker, was made a party to that action, while Brucker is the only defendant in the current action. In any event, neither of the parties in this case has raised any issues of *res judicata* or collateral estoppel with respect to the Missouri action in the briefs on appeal, and we therefore proceed to hear this case *de novo* on its merits.

N.E.2d 508 (1992), quoting *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 474, 510 (1967). In ruling on a motion for judgment *n.o.v.*, the court must consider the evidence in the light most favorable to the nonmovant. *Maple*, 151 Ill. 2d at 453, 603 N.E.2d at 512. Hence, the court may not weigh the evidence or consider the credibility of witnesses; indeed, where a "substantial factual dispute" exists, or witness credibility may be decisive to the outcome, the court has no right to enter judgment *n.o.v. Maple*, 151 Ill. 2d at 454, 603 N.E.2d at 512.

A. Gap in the Record

As a threshold matter, Brucker contends that the grant of judgment notwithstanding the verdict must be affirmed due to Cambridge's failure to include Brucker's motion for judgment *n.o.v.* in the record. Cambridge responds that the content of the motion has no bearing upon our resolution of the issues involved, so lack of inclusion is immaterial.

As Brucker points out, it is the appellant's duty to present the court with a proper record on appeal, so that the court has an adequate basis for reviewing the decision below. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156, 839 N.E.2d 524, 531 (2005). When there is a gap in the record that could have a material impact on the outcome of the case, the reviewing court will presume that the missing evidence supported the judgment of the trial court and resolve any doubts against the appellant. *Corral*, 217 Ill. 2d at 157, 839 N.E.2d at 532, citing *Foutch v. O'Bryant,* 99 Ill. 2d 389, 392, 459 N.E.2d 958, 959 (1984). In this case, Cambridge included a copy of Brucker's judgment *n.o.v.* motion in the appendix to its brief. However, this does not change our analysis, because attachments to briefs may not be used to supplement the record. *Jones v. Police Board of the City of Chicago*, 297 Ill. App. 3d 922, 930, 697 N.E.2d 876, 881

No. 1-06-0798

(1998).

Nevertheless, this omission from the record is not automatically fatal to Cambridge's claim. In instances where the court has all the evidence it needs to make a proper decision on the merits under the appropriate standard of review, the court may undertake substantive analysis of the case even if the record is not fully complete. *Gonnella Baking Co. v. Clara's Pasta Di Casa, Ltd.*, 337 Ill. App. 3d 385, 388, 786 N.E.2d 1058, 1061 (2003) (reviewing a trial court's ruling on a motion to dismiss despite appellant's failure to provide a transcript of the hearing on the motion, reasoning that the pleadings and supporting documents were sufficient grounds for a decision); *In re Marriage of Ward*, 282 Ill. App. 3d 423, 430, 668 N.E.2d 149, 153-54 (1996).

In the case at hand, Brucker's motion is largely immaterial to our ruling on whether the trial court erred in issuing judgment *n.o.v.* The trial court's reasoning is fully laid out in its order, which has been preserved in the record, along with all of the evidence the trial court used in coming to its conclusion. Hence, Cambridge is correct in urging that we may proceed to the merits of its claim. However, to the limited extent that Brucker's motion could be material, we shall apply the standard articulated in *Corral* and presume that the contents of the missing motion favor Brucker's position.

B. Enforceability of the Noncompetition Clause

Cambridge contends that the trial court erred in finding that the noncompetition covenant was unenforceable as a matter of law. It advances two main arguments in support of its contention. First, it argues that the geographic scope of the covenant was reasonable, given the testimony regarding the reach of Cambridge's business throughout the United States and Canada.

-12-

No. 1-06-0798

It also contends that the trial court incorrectly excluded testimony that would tend to show the reasonableness of the covenant's scope. Second, it argues that the covenant was reasonable with respect to the restrictions it placed upon Deger's activities upon leaving the company.

1. Choice of Law

Before we can analyze the enforceability of Cambridge's restrictive covenants, we must first consider what law to apply. Cambridge argues that because Deger's employment agreement contains a Missouri choice of law provision, we should use Missouri law in evaluating its validity.[2] However, it is not necessary for us to undertake choice of law analysis, since as shall be discussed below, the prevailing law in Missouri and Illinois is substantially similar as to the enforceable scope of post-employment restrictive covenants, and in any event, it would bring us to the same conclusion with respect to the enforceability of the covenants at issue in this case. *McGrew v. Pearlman*, 304 Ill. App. 3d 697, 701, 710 N.E.2d 125, 128 (1999) (if there is no conflict in the laws of the states at issue, it is unnecessary for the court to undertake choice of law analysis).

Postemployment restrictive covenants operate as partial restrictions on trade, so they are scrutinized carefully by both Illinois and Missouri courts. *Arpac Corp. v. Murray*, 226 Ill. App.

---

[2] Brucker does not explicitly challenge this contention, but it only cites Illinois law in arguing that the noncompetition covenant is unenforceable.

We note that Cambridge does not contend on appeal that Missouri law should apply to the other issues in the case, merely to the issue of enforceability; hence, we shall limit the choice of law discussion to this issue.

-13-

3d 65, 75, 589 N.E.2d 640, 649 (1992); *Easy Returns Midwest, Inc. v. Schultz*, 964 S.W.2d 450, 453 (Mo. 1998); see *Jefco Laboratories, Inc. v. Carroo*, 136 Ill. App. 3d 793, 797, 483 N.E.2d 999, 1001-02 (1985). For a restrictive covenant to be valid and enforceable in Illinois, the terms must be "reasonable and necessary to protect a legitimate business interest of the employer." *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 138, 685 N.E.2d 434, 441 (1997). Reasonableness of a restrictive covenant is to be decided by the judge as a matter of law. *Lawrence & Allen*, 292 Ill. App. 3d at 137, 685 N.E.2d at 440; *Eichmann v. National Hosp. and Health Care Services, Inc.*, 308 Ill. App. 3d 337, 339, 719 N.E.2d 1141, 1143 (1999). Relevant considerations include the hardship caused to the employee, the effect upon the general public, and the scope of the restrictions. This requires the courts to consider the propriety of the limitations in terms of their length in time, their territorial scope, and the activities that they restrict. *Lawrence and Allen*, 292 Ill. App. 3d at 138, 685 N.E. 2d at 441. Because of the importance of these factors, reasonableness is not something that can be determined in the abstract. Rather, it necessarily depends on the unique facts and circumstances of each case. *Eichmann*, 308 Ill. App. 3d at 339, 719 N.E.2d at 1143. An employer seeking to enforce a restrictive covenant bears the burden of demonstrating that the full extent of the restraint is necessary for protecting its interests. *Health Professionals, Ltd. v. Johnson*, 339 Ill. App. 3d 1021, 1034, 791 N.E.2d 1179, 1192 (2003).

Missouri law adopts essentially the same standard for enforceability, with some nondispositive variation regarding permissible territorial scope, which shall be discussed below. See *Continental Research Corp. v. Scholz*, 595 S.W.2d 396, 400 (Mo. App. 1980) ("[T]o the

extent a non-compete agreement is not demonstrably reasonable, a court may not decree enforcement of its terms"); *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. 1985) ("Covenants against competition must serve a proper interest of the employer in protecting the good will of a business, and must be reasonably limited in time and space"); *Schott v. Beussink*, 950 S.W.2d 621, 626 (Mo. App. 1997) ("Temporary and spatially limited restraints are enforceable if reasonable under all attending circumstances and if enforcement serves the employer's legitimate interests"). As in Illinois, Missouri courts also place the burden of demonstrating reasonableness upon the party claiming the benefit of the restrictive covenant. *Continental Research*, 595 S.W.2d at 400.

2. Territorial Scope of the Noncompetition Clause

We thus move to consider whether the territorial scope of the covenant is reasonable, as Cambridge would have us rule. In assessing this issue, "courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business." *Lawrence & Allen*, 292 Ill. App. 3d at 139, 685 N.E.2d at 442; *Arpac Corp.*, 226 Ill. App. 3d at 77, 589 N.E.2d at 650. The underlying policy behind this doctrine in Illinois law is that the employee should only be excluded from doing business in the territorial zone in which relationships with the employer's customers could have been established in ways that could be detrimental in the hands of a competitor. *Lawter International, Inc. v. Carroll*, 116 Ill. App. 3d 717, 727, 451 N.E.2d 1338, 1345 (1983) (discussing the permissible scope of noncompetition covenants with respect to salespeople). Missouri law is similar, though somewhat more employer-friendly: it allows restrictive covenants to extend beyond the area in which the employee has personally done

-15-

business, as long as the circumscribed zone is not "larger than reasonably necessary for the protection of the covenantee." *Renwood Food Products v. Schaefer*, 223 S.W.2d 144, 152 (Mo. App. 1949); see also *Schnucks Twenty-Five, Inc. v. Bettendorf*, 595 S.W.2d 279, 286 (Mo. App. 1979). However, as noted, regardless of which state law applies, the overall result with respect to the noncompetition clause in this case is the same.

During the trial, Kramer testified that Cambridge had activity in Canada during the time that it employed Deger, but he admitted that it did not do business in all provinces – thus falling short of the requirements outlined in the cases above. Cambridge points to Deger's undisputed testimony that he assisted Cambridge in sales activities in Canada. While this is not incorrect, the cited sales activities consist of a single business trip to Toronto, which does not serve to contradict Kramer's statement that business was not conducted within the entirety of Canada. Hence, under the standards articulated in *Lawter* and in *Renwood*, the trial court was correct in finding that the covenant not to compete had an overbroad geographic scope as a matter of law. The evidence well supports the conclusion that the geographic scope, in excluding all of Canada, was broader than it reasonably should have been under either the Illinois or the Missouri standard: the president of Cambridge conceded that the company did not have a market in all of Canada, and Deger himself stated that he visited Toronto once and was not aware of Cambridge customers in Canada. Hence, a Canada-wide ban covered substantial areas in which Cambridge did not do business and was therefore unnecessary for the protection of Cambridge's legitimate interests. See *Renwood Food Products*, 223 S.W.2d at 152.

Cambridge also alleges that the trial court erred in excluding evidence that would have

helped to demonstrate the reasonableness of the covenant's geographic scope. Specifically, it points to the trial court's refusal to allow counsel to ask Kramer whether Deger's information on Cambridge's technology and pricing strategies would be useful to competitors. We find that even if the trial court erred in excluding this testimony, it would be harmless error, because Kramer's answers to this question would not change our view of the covenant's territorial overbreadth. Certainly it would make no difference under Illinois law: such testimony would not establish that Deger himself had relationships with the customers in Canada, which Deger in fact denied. See *Lawter*, 116 Ill. App. 3d at 727, 451 N.E.2d at 1345. Furthermore, even under Missouri law, where the scope of Deger's employment activities is not a decisive factor, the uncontroverted testimony of Cambridge's president indicates that there is "not even a market" for Cambridge's products in all provinces of Canada, thus indicating that it is unnecessary for Cambridge to prevent competition throughout the entire nation in order to guard its legitimate interests. See *Renwood Food Products*, 223 S.W.2d at 152.

3. Activities Restricted by the Noncompetition Clause

Furthermore, the alleged overbreadth of the noncompetition covenant in this case does not end with mere geography: Brucker challenges the reasonableness of the extent of the restrictions that are placed on Deger's posttermination activities. In its judgment *n.o.v.* order, the trial court stated that Cambridge interpreted the covenant as preventing Deger from taking "any job, even as a janitor, with any of the Plaintiff's competitors." Cambridge contends that this is an overbroad interpretation of the covenant not called for by the text itself. Brucker, on the other hand, argues that this is the most natural reading of the contractual language, so the trial court did not err in its

No. 1-06-0798

judgment.

Contract interpretation is a question of law, to be reviewed *de novo* on appeal. *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1142, 835 N.E.2d 965, 970 (2005). In doing so, the court seeks to determine and give effect to the parties' intent, as evidenced by the language of the contract itself. *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521, 757 N.E.2d 952, 956 (2001). Hence, when the language of a contract is unambiguous, then the court will look to the language of the contract alone, without resorting to extrinsic evidence. *River's Edge Homeowners' Assn v. City of Naperville*, 353 Ill. App. 3d 874, 878, 819 N.E.2d 806, 809 (2004), citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999). However, when an ambiguity exists, use of extrinsic evidence to resolve the ambiguity is permissible. *River's Edge Homeowners' Ass'n*, 353 Ill. App. 3d at 878, 819 N.E.2d at 809. Language is ambiguous when it is susceptible to more than one reasonable interpretation (*Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 620, 863 N.E.2d 743, 759 (2007)), and the mere fact that the parties disagree about the interpretation of a contractual provision does not automatically render it ambiguous. *In re Marriage of Druss*, 226 Ill. App. 3d 470, 476, 589 N.E.2d 874, 879 (1992).

The relevant contractual language, from the noncompetition clause in paragraph 7(c), states that Deger may not "engage in any activity for or on behalf of Employer's competitors, or engage in any business that competes with Employer." The issue is whether the phrase "that competes with Employer" applies to both clauses, or only to the second clause. Cambridge takes the former interpretation; thus, only activities that compete with Cambridge are prohibited.

-18-

Brucker and the trial court take the latter interpretation, under which all activities on behalf of competitors are barred, regardless of whether they are actually competitive.

We find that the contractual language clearly and unambiguously supports Brucker's interpretation. Each clause has a separate verb, indicating they are to be read separately; thus, the more natural reading by far is that the phrase "that competes with Employer" modifies the second clause only. In addition, if the phrase were to modify both clauses, then it would render meaningless the phrase "for or on behalf of Employer's competitors" in the first clause: if only competitive activity is barred, then it becomes unnecessary to further limit the scope of that clause to activity done on behalf of competitors. Rather than adopting a stilted reading that turns part of the provision into mere surplusage, we choose the interpretation that gives full effect to the language used by Cambridge in its contract.

Furthermore, even if the language of the contract were ambiguous on its face, a conclusion that we reject, Kramer's testimony would have provided dispositive parol evidence that Brucker's interpretation is the correct one. As noted, Kramer agreed with counsel's contention that the St. Louis injunction action was brought to prevent Deger from working for a competitor in any capacity. These words are crucial, as they speak to Cambridge's intent with respect to the contractual language at stake: they indicate that Cambridge intended the noncompetition clause to foreclose employees from engaging in any activity on behalf of competitors, regardless of whether it could be construed as directly competitive. Contrary to Cambridge's assertions, the fact that Kramer is a layperson does not render his testimony on this matter irrelevant; Kramer was not being asked to render a legal conclusion on the existence or

enforceability of the contract, as was the case in *Central Ice Cream Co. v. Sweetheart Cup Corp.*, 40 Ill. App. 3d 43, 48, 351 N.E.2d 396, 399 (1976). Indeed, lay testimony may be used by courts to aid in interpretation of facially ambiguous contract language. See, e.g., *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*, 338 Ill. App. 3d 1010, 1021, 788 N.E.2d 405, 414 (2003) (when construing an ambiguous term in a contract for sale of a car, trial court did not err in considering testimony of car dealership's coowner regarding the meaning of the term). Hence, Kramer's testimony indicates what Cambridge's understanding was, and, thus, what its intent may have been in drafting the covenant not to compete, a consideration that would be highly relevant in resolving any ambiguity. *Eichengreen*, 325 Ill. App. 3d at 521, 757 N.E.2d at 956.

Cambridge argues that Kramer's testimony did not concern the proper interpretation of the contract, but rather the relief that Cambridge sought in the St. Louis case. This distinction is without merit. In the St. Louis case, Cambridge was suing to enforce the restrictive covenants in the contract. Thus, Kramer's view of the purpose of the lawsuit should be in sync with his view of the proper interpretation of the contract. Although Kramer testified that he did not know the specific basis for the prayer for relief in the St. Louis Case, he made it clear elsewhere that he understood that enforcement of the contract was the general goal.

Thus, we find that, pursuant to the unambiguous language of the contract, to which Kramer's testimony subscribed, the restrictive covenants purport to prohibit Deger from any activity on behalf of a competitor. We now move to consider whether that broad scope is reasonable.

Restrictions on activities "should be narrowly tailored to protect only against activities

that threaten the employer's interest." *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 140, 685 N.E.2d 434, 442 (1997). Hence, they will be found valid if they are no broader than necessary to protect the employer's legitimate business interests. *Dryvit System, Inc. v. Rushing*, 132 Ill. App. 3d 9, 12, 477 N.E.2d 35, 38 (1985); see *Schott v. Beussink*, 950 S.W.2d 621, 626 (Mo. App. 1997).

In light of this standard, we cannot find the noncompetition clause to be reasonable with respect to the activities it prohibits. To be sure, some activities barred under this clause – such as the alleged solicitation activities being carried on by Deger – could indeed be detrimental to Cambridge, and Cambridge would have a right to prevent such actions through contract. But a blanket bar on all activities for competitors, as is indicated by Kramer's testimony, is excessive in light of the limited arenas in which Deger's knowledge would be competitively useful. If Deger were working for Brucker in an entirely noncompetitive capacity, he would still be violating the terms of the contract, though no interest of Cambridge would be harmed. Such blatant overbreadth goes far beyond the standard for acceptable activity restrictions outlined in *Lawrence & Allen*, 292 Ill. App. 3d at 140, 685 N.E.2d at 442. Hence, for this reason as well, we find that the trial court did not err in finding the noncompetition clause to be unenforceable as a matter of law.

C. Nonsolicitation Clause as an Alternate Ground for Recovery

Cambridge contends that, even if the noncompetition covenant is unenforceable, the non-solicitation covenant provides an independent alternative ground for recovery. It argues that because the trial court based its ruling solely on the noncompetition covenant, without making

any ruling as to the enforceability of the nonsolicitation covenant, its grant of judgment *n.o.v.* was in error. Moreover, Cambridge contends that since Brucker failed to argue that the nonsolicitation covenant was invalid in its original motion for judgment *n.o.v.*, it has waived any such argument on appeal.

Brucker has two arguments in response. First, it claims that this defense is waived because Cambridge did not include it in its response to Brucker's original motion for judgment *n.o.v.* Second, it substantively argues that the distinction that Cambridge attempts to draw between the noncompetition clause and the nonsolicitation clause is without merit because the nonsolicitation clause is part of the contractual covenant not to compete, and that the trial court ruling encompasses both clauses.

We agree with Brucker's contention that Cambridge has waived any right to argue for the first time on appeal that the non-solicitation clause provides an independent basis for recovery. "It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal." *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536, 662 N.E.2d 1248, 1253 (1996). Waiver is generally considered an admonition to the parties, not a jurisdictional limitation, and therefore it is no impediment to an appellate court's ability to address issues of law. *Caparos v. Morton*, 364 Ill. App. 3d 159, 180, 845 N.E.2d 773, 792 (2006)[3];

---

[3] Contrary to Cambridge's implication in its brief, *Caparos* does not stand for the proposition that the waiver doctrine is inapplicable to issues of law. Rather, it serves as a grant of discretion to appellate courts to consider necessary issues of law even if they arguably were waived by the parties below.

*People v. McKay*, 282 Ill. App. 3d 108, 111, 668 N.E.2d 580, 583 (1996).  Underlying the doctrine of waiver is a desire to "to preserve finite judicial resources by creating an incentive for litigants to bring to trial courts' attention alleged errors, thereby giving trial courts an opportunity to correct their mistakes." *McKay*, 282 Ill. App. 3d at 111, 668 N.E.2d at 583.  Another key purpose of the waiver doctrine is to prevent unfair prejudice to an opposing party: If one party neglects to raise an argument at the trial level, the adversary may be forestalled from presenting evidence in rebuttal, and thus it is proper to bar the first party from springing the argument at the appellate level where the presentation of evidence is no longer possible.  *Daniels v. Anderson*, 162 Ill. 2d 47, 59, 642 N.E.2d 128, 134 (1994) (upholding a finding of waiver on grounds that "Had [defendant] raised the equitable conversion doctrine in the trial court, [plaintiff] may have responded specifically to this theory with evidence and argument").

In the case at hand, Cambridge made no argument whatsoever to separate the nonsolicitation clause from the noncompetition clause, such that if one were defeated, the other might still survive.  Other than mentioning them both in the complaint, it does not present them as separate and independent grounds for recovery; it merely prays for relief based on the covenants as a whole.  Furthermore, while Cambridge vigorously argues for the enforceability of the noncompetition clause in its opposition to Brucker's judgment *n.o.v.* motion, it never contends that the nonsolicitation clause should be considered an independent ground for relief.  Thus, for all intents and purposes, Cambridge's assertion of the non-solicitation clause as a separate ground for recovery arises for the first time on appeal and is therefore waived.  See *Haudrich*, 169 Ill. 2d at 536, 662 N.E.2d at 1253.

No. 1-06-0798

We also find that there is no corresponding waiver on the part of the appellee, Brucker. It is well settled that an appellee may raise a defense for the first time on appeal, as long as the facts upon which that defense was predicated are in the trial record. *Stratman v. Brent*, 291 Ill. App. 3d 123, 133, 683 N.E.2d 951, 958 (1997).[4]

Moreover, even if we were to conclude that Cambridge's argument regarding the non-solicitation clause were not waived by Cambridge's failure to adequately present it below, it would have no effect on our ultimate determination of the case, for we find that the non-solicitation clause is unreasonably overbroad and thus unenforceable as a matter of law. The fact that the trial court made no explicit ruling to this effect does not affect our analysis, as we are not bound by the reasoning given by the trial court, and we may affirm on any grounds that are justified by the record. *In re Estate of Funk*, 221 Ill. 2d 30, 96, 849 N.E.2d 366, 403 (2006).

Cambridge, however, is correct in its contention that if the trial court based its ruling solely upon the unenforceability of the noncompetition clause, and if the nonsolicitation clause were to be valid, then in the absence of waiver by Cambridge, the court's decision to grant judgment *n.o.v.* would not be sustainable. See 735 ILCS 5/2-1201(d) (West 2006) ("If several

---

[4] Cambridge cites *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 415 N.E.2d 337 (1980), in support of its contention that Brucker waived any argument regarding enforceability of the nonsolicitation clause. However, *Brown* is not on point, because it dealt with an appellant's attempt to raise issues on appeal that it had failed to include in a posttrial motion. *Brown*, 83 Ill. 2d at 348-49, 415 N.E.2d 339. As Brucker is the appellee in this case and is not alleging that the trial court erred in its judgment, the holding of *Brown* does not apply.

-24-

grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict"). As Cambridge asserts, noncompetition and nonsolicitation clauses are ordinarily treated as distinct from each other by courts. In particular, while noncompetition covenants must have a reasonable geographic scope, the same is not true of nonsolicitation covenants; no geographic limitation is necessarily required for them. *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 139 (1997); *Schott v. Buessink*, 950 S.W.2d 621, 627 (Mo. App. 1997). This is due to the fact that a tightly drafted nonsolicitation clause will narrowly circumscribe the class of people with whom contact is prohibited, so it need not preclude the availability of future employment opportunities, and as a result, territorial limits may not be necessary in order to protect employees' interests in finding posttermination employment. See *Schott*, 950 S.W.2d at 627. Thus, in the absence of waiver, the fact that Cambridge's noncompetition clause is unenforceable would not automatically render its nonsolicitation clause unenforceable, even though they share the same geographic scope.

Nevertheless, we find Cambridge's nonsolicitation clause to be independently invalid on its face, due to the sweeping restrictions it places upon the contacts that ex-employees may have with Cambridge customers. A nonsolicitation clause is only valid if "reasonably related to the employer's interest in protecting customer relations that its employees developed while working for the employer." *Lawrence & Allen*, 292 Ill. App. 3d at 138, 685 N.E.2d at 441. As a result, courts are reluctant to enforce provisions that prohibit former employees from servicing

customers that they never had contact with while working for their original employer. *McRand, Inc. v. Van Beelen*, 138 Ill. App. 3d 1045, 1057, 486 N.E.2d 1306, 1315 (1985); see *Jefco Laboratories, Inc. v. Carroo*, 136 Ill. App. 3d 793, 799, 483 N.E.2d 999, 1003 (1985) (upholding the trial court's ruling that a restrictive covenant was unreasonable because, among other factors, it prohibited sales "not only against customers that defendants solicited, but also against customers that defendants never solicited and do not know"). In this case, the nonsolicitation covenant extends broadly to "any customer, employee or representative of Employer," regardless of whether Deger had contact with them as a Cambridge employee. Moreover, the language encompasses companies that may have become customers after Deger left the company, as well as past customers of Cambridge. This is far broader than necessary to protect Cambridge's interest in preventing Deger from abusing the specific client relationships he built up during his time with the company. *Jefco Laboratories*, 136 Ill. App. 3d at 799, 483 N.E.2d at 1003; see *Lawrence & Allen*, 292 Ill. App. 3d at 139, 685 N.E.2d at 442 (finding that a covenant prohibiting a former employee from soliciting "any client" of his employer, without further limitation, was unreasonable). Accordingly, regardless of our ruling on the issue of waiver, Cambridge's argument regarding the independent enforceability of the nonsolicitation clause must fail.

D. Judicial Reformation of the Agreement

Cambridge offers up an alternative argument to preserve the covenants at issue: to the extent that the restrictive covenants are unenforceable, it asserts that the court should have rewritten them to make them fall within the bounds of reasonableness, rather than simply invalidate them outright. It argues that even if the covenants were to be considered *per se*

overbroad, they are not overbroad as applied to Deger in his work with Brucker, because that was directly competitive in a way that proved detrimental to Cambridge's customer interests. Therefore, Cambridge says, the covenants should be amended by the court to be reasonable in scope, pursuant to section 9(e), which provides that if any term is found to be unenforceable "such term or provision shall be automatically amended to be effective to the fullest extent permitted by law."

However, Cambridge did not raise this issue in its pleadings, nor did it bring this issue before the trial court. An appellant may not raise an issue for the first time on appeal; issues not raised below are considered waived. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 413, 775 N.E.2d 951, 957 (2002). Hence, we find that Cambridge has waived this issue and we may not consider it.

In addition, we note in passing that allowing extensive judicial reformation of blatantly unreasonable posttermination restrictive covenants may be against public policy, because of the potentially severe effect it could have on the employees who are subject to such covenants. Such reformation, if permitted by courts, would give employers an incentive to draft restrictive covenants as broadly as possible, since the courts would automatically amend and enforce them to the extent that they were reasonable in the particular circumstances of each case. This could have a severe chilling effect on employee posttermination activities; an employee unschooled in the law cannot be expected to know to what extent such a covenant is enforceable, particularly since courts apply a multifactor reasonableness standard instead of a bright-line rule. Thus it is possible that under such a regime, an intentionally overbroad covenant could end up tying an employee's

hands for years although a majority of courts would find it unreasonable on its face. Hardship to employees is one significant factor to consider in determining the propriety of a restrictive covenant. *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 292 Ill. App. 3d 131, 138, 685 N.E.2d 434, 441 (1997). Insofar as judicial reformation of restrictive covenants increases that hardship, it should be looked upon with suspicion.

This is not to say that judicial reformation is never permissible. In some circumstances, courts may choose to modify an overbroad restrictive covenant rather than invalidate it outright. See *Weitekamp v. Lane*, 250 Ill. App. 3d 1017, 1027, 620 N.E.2d 454, 461 (1993) (upholding the trial court's decision to modify a covenant not to compete based on a finding that the original covenant "was not extremely unfair nor did it extensively restrain trade"); *Arpac Corp. v. Murray*, 226 Ill. App. 3d 65, 80, 589 N.E.2d 640, 652 (1992) (upholding the lower court's modification of a restrictive covenant where the modification was only slight and "the balance of the restrictions were reasonable" to protect the plaintiff company's interests). However, when deciding whether modification is appropriate, the fairness of the restraints contained in the contract is a key consideration. *North American Paper Co. v. Unterberger*, 172 Ill. App. 3d 410, 416, 526 N.E.2d 621, 625 (1988). Thus the *Unterberger* court found that the trial court did not err in failing to consider modification of a restrictive covenant that was " 'unconscionable, unreasonable, [and] overbroad in its application and scope.' " *Unterberger*, 172 Ill. App. 3d at 416, 526 N.E.2d at 625. The restrictive covenants in the case at hand are more akin to the one in *Unterberger* than the ones in *Weitekamp* and *Arpac*: as discussed earlier, both the non-compete and non-solicitation clauses in Deger's contract are severely overbroad, so that significant

modification would be necessary to make them conform to legal standards of reasonableness. Hence, even if this argument had not been waived by Cambridge, the trial court would not have been required to drastically curtail the terms of Deger's restrictive covenants in order to make them enforceable grounds for recovery in this case against Brucker.

## III. CONCLUSION

Because we find both the noncompetition and nonsolicitation clauses to be unreasonable and therefore invalid, it is not necessary for us to reach Brucker's argument regarding the reasonableness of Cambridge's claimed damages or, for that matter, the issue of Cambridge's entitlement to punitive damages.

Accordingly, for the foregoing reasons, the judgment of the trial court is affirmed.

McBRIDE, P.J., and O'MALLEY, J., concur.