2024 IL App (1st) 221184-U
No. 1-22-1184

FIRST DIVISION
August 26, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| CELLO PROPERTY TEMPE LLC, formerly known as Avondale Commons LLC, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) ) | No. 2020 CH 04399 |
| v. | ) ) | |
| AGC ADDISON OWNER, LLC, | ) ) | The Honorable Caroline Kate Moreland, |
| Defendant-Appellee. | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1        *Held:* The agreement granted the seller the right to multiple, sequential adjournments of the closing date, and the seller did not breach its duty of good faith and fair dealing when it attempted to adjourn the closing date a second time.

¶ 2        This matter is a breach of contract case brought by plaintiff-appellant Cello Property Tempe, LLC, formerly known as Avondale Commons, LLC (Purchaser), against defendant-appellee AGC Addison Owner, LLC (Seller) over a Sale-Purchase Agreement (SPA) to purchase parcels of real property containing two commercial buildings. The parties filed cross-motions for

summary judgment before the circuit court. The circuit court denied Purchaser's motion, granted Seller's motion, and entered judgment in favor of Seller.

¶ 3    On appeal, Purchaser asserts that the circuit court erred when it denied Purchaser's motion for summary judgment and granted Seller's motion for summary judgment. Purchaser maintains Seller breached a condition precedent under Section 36.2 of the SPA and otherwise violated the duty of good faith and fair dealing. For the following reasons, we affirm the circuit court's entry of summary judgment in favor of Seller and against Purchaser.

¶ 4                                    I. BACKGROUND

¶ 5    On February 20, 2020 (Effective Date), Purchaser and Seller entered into the SPA whereby Purchaser was to purchase commercial real estate located at 3443 and 3555 West Addison Street, Chicago, Illinois (Property) for $48 million. At the time, the Property had three commercial tenants, Olive Garden, Floor & Décor, and Fitness International, LLC (LA Fitness). Pursuant to section 2.1 of the SPA, Purchaser made an initial deposit of $1 million to the escrow agent, Chicago Title Insurance Company (Escrow Agent).

¶ 6                          A. Relevant Contractual Provisions

¶ 7    Pursuant to section 4.1 of the SPA, the "Initial Scheduled Closing Date" was to take place 30 days after the Effective Date, on March 23, 2020. Sections 4.1 and 4.4 of the SPA defined "Closing" as the "consummation of the transactions contemplated" by the SPA and "Closing Date" as "the Initial Scheduled Closing Date, or, if the Closing is adjourned, any Seller Adjourned Closing Date, or the Purchaser Adjourned Closing Date", respectively. (emphasis added).

¶ 8    The SPA granted Purchaser and Seller different rights regarding adjournment of the closing date. Pursuant to section 4.2 of the SPA, Purchaser was permitted a "one-time right" to adjourn

the closing date no later than thirty days after the Initial Scheduled Closing Date. On the other hand, pursuant to section 4.3 of the SPA, Seller was permitted:

> "to adjourn the Closing <u>one or more times</u> solely for the <u>reasons</u> expressly specified in Section 4.4, <u>Section 8</u>, Section 11, Section 35, <u>Section 36</u>, Section 42, or Section 47 of this Agreement and <u>for the period specified in such Sections</u> of this Agreement. <u>Any date to which Seller adjourns the Closing</u> pursuant to this Section 4.3 or pursuant to any other provision of this Agreement shall be herein referred to herein as a "<u>Seller Adjourned Closing Date</u>"[]." (emphasis added).

¶ 9　　　　In section 4.4, the parties expressly agreed that "time is of the essence with respect to Seller's and Purchaser's obligations to close" the transaction on the closing date. Further stating:

> "For the avoidance of doubt, the parties acknowledge[] that if Seller or Purchaser, as applicable, adjourns the Closing Date pursuant to any right of adjournment, expressly granted hereunder, then time shall be of the essence with respect to Seller's and Purchaser's obligation to close this transaction on such adjourned Closing Date, subject to any expressly provided notice and cure rights herein. As used herein, the term "Closing Date" shall mean the Initial Scheduled Closing Date, or, if the Closing is adjourned, any Seller Adjourned Closing Date, or the Purchaser Adjourned Closing Date." (Time is of the Essence Clause).

¶ 10    Section 8.3 of the SPA required Seller to remove any exceptions and encumbrances to the title. In accordance with section 4.3, section 8.3 contained a provision that allowed Seller "the right to adjourn the Closing Date one or more times (but for not more than thirty (30) days in the aggregate) in order to effectuate its obligations hereunder."

¶ 11    As a condition precedent to Purchaser's obligation to purchase the Property, section 36.2 required Seller to deliver tenant estoppel certificates to Purchaser from each of the commercial tenants "at Closing" (Estoppel Condition).[1] If Seller was "unable to satisfy the Estoppel Condition on or before Closing," then Purchaser had the right to terminate the SPA. Particularly significant to this appeal, section 36.2 also contained adjournment language that "acknowledged that Seller had the right to adjourn the Closing Date one or more times (but _for not more than thirty (30) days in the aggregate_) _in order to satisfy_ the Estoppel Condition . . ." (emphasis added). Section 36.3(b) required the tenant estoppel certificates to be dated no earlier than thirty days prior to the closing date.

¶ 12    The time of performance of obligations under the SPA was dictated by section 42 of the SPA:

> "In the event the provisions of this Agreement provide that Purchaser or Seller shall have the right to adjourn the performance of an obligation by Purchaser or Seller, as applicable to a day that is other than a Business Day, then Purchaser or Seller, as applicable, shall have the right to adjourn the time of the performance of such obligation to the first (1st) Business Day immediately succeeding

---

[1] Section 35(c) provided that satisfaction of the Estoppel Condition "on or before the Closing Date" is a condition precedent to Purchaser's obligation to purchase the Property and consummate the transaction.

the day on which such obligation would <u>otherwise</u> be required to be performed." (emphasis added).

¶ 13        B. Purchaser's Adjournment Notice and Seller's First Adjournment Notice

¶ 14        On March 11, 2020, Purchaser exercised its "one-time right" to extend the closing date for thirty days from the Initial Scheduled Closing Date, until April 22, 2020, pursuant to section 4.2 of the SPA. In accordance with section 4.2, Purchaser deposited an additional $500,000.00 with the Escrow Agent.

¶ 15        On April 13, 2020, Seller gave its first notice to extend the closing date (First Adjournment Notice). The notice stated that Seller was exercising its right to adjourn the closing date pursuant to sections 4.3 and 36.2 of the SPA in order to satisfy the Estoppel Condition. Seller adjourned the closing date for 30 days, until May 22, 2020 (May 22, 2020 Adjourned Closing Date).

¶ 16        C. Tenant Estoppel Certificate Issues

¶ 17        Meanwhile, beginning mid-March 2020, Seller began working through certain issues with the tenant estoppel certificates. Specifically, Seller had issues obtaining the certificate from LA Fitness because LA Fitness and Seller could not agree to a date by which the tenant obligations were to begin (Delivery Date) due to force majeure events and landlord delays. Additionally, in mid-April, Purchaser notified Seller that it believed that the proposed LA Fitness tenant estoppel certificate was deficient because the proposed certificate contained material, adverse information or omissions.

¶ 18        While Purchaser knew of the issues with the LA Fitness tenant estoppel certificate, around mid to late-March 2020, Seller was also dealing with issues with the Floor & Décor and Olive Garden tenant estoppel certificates. In particular, Floor & Décor had certified that Seller owed it $2,415,000 in reimbursable expenses and Olive Garden certified that Seller had failed to perform

its maintenance obligations. Purchaser was not made aware of these issues at any point in time while the parties worked towards closing the transaction.

¶ 19                              D. Seller's Second Adjournment Notice

¶ 20        After Seller's First Adjournment Notice, on May 20, 2020, Seller informed Purchaser through a second notice (Second Adjournment Notice) that it was again adjourning the closing date. This time Seller adjourned the closing date in accordance with sections 4.3 and 8.3 of the SPA. That Second Adjournment Notice stated that Seller adjourned the closing date for another 30 days, until June 22, 2020 (June 22, 2020 Adjourned Closing Date). At the time, Seller had a mortgage through its lender, Mesa West Real Estate Income Fund IV, LLC (Mesa), which encumbered the title to the Property. Mesa's loan agreement allowed the loan to be prepaid in full but required Seller to provide Mesa with "not less than fifteen (15) days' (but no more than sixty (60) days') prior written notice . . ." Seller had not provided notice of prepayment to Mesa by May 20, 2020 when it sought to adjourn the May 22, 2020 Closing Date for another 30 days.

¶ 21        E. Purchaser Disputes Seller's Second Adjournment and Terminates the SPA

¶ 22        In response to Seller's Second Adjournment Notice, on May 21, 2020, Purchaser informed Seller that it believed that Seller was not entitled to any further adjournment of the closing date unless Seller satisfied the Estoppel Condition by delivering the tenant estoppel certificates by the following day, May 22, 2020. Purchaser further informed Seller that it intended to exercise its right to terminate the SPA under section 36.2 if the Estoppel Condition was not satisfied by May 22, 2020. Purchaser also took issue with the fact that Seller's Second Adjournment Notice failed to identify the lien encumbering the Property and which required adjournment under section 8.3.

¶ 23        On May 22, 2020, Seller responded to Purchaser's letter. Seller emphasized that the SPA permitted Seller to adjourn the closing date multiple times. Seller stated its position that the

Estoppel Condition need only be satisfied on or before the new closing date of June 22, 2020 pursuant to the Second Adjournment Notice, rather than by the prior May 22, 2020 Adjourned Closing Date. Seller emphasized that if the tenant estoppel certificates were delivered and dated May 22, 2020, they would become stale by the June 22, 2020 Adjourned Closing Date pursuant to section 36.3 as they would be dated over 30 days prior to the closing date. Additionally, Seller identified the Mesa Mortgage as the lien encumbering the Property even though, as Seller pointed out, there is no language in the SPA which required Seller to disclose the lien. Seller stated that it was not able to provide notice of prepayment of the mortgage because it was continuing to work on "satisfying conditions to closing, including, without limitation, obtaining evidence of the 'Delivery Date' under the LA Fitness Lease . . . and obtaining the estoppel certificates . . ."

¶ 24     On May 22, 2020, Purchaser delivered its notice of termination of the SPA and requested the Escrow Agent return Purchaser's $1,500,000 deposit which was comprised of Purchaser's original $1,000,000 deposit and subsequent $500,000 deposit (Termination Notice). Seller disputed the release of the deposit to Purchaser. Due to the parties' dispute, the Escrow Agent held the $1,500,000 deposit.

¶ 25     F. Procedural History and Cross-Motions for Summary Judgment

¶ 26     Thereafter, Purchaser filed a single-count complaint seeking a declaration that its Termination Notice was valid and that it was entitled to a return of the $1,500,000 held in escrow. Seller filed a two-count counterclaim for breach of contract alleging that Purchaser breached the SPA by terminating the agreement on May 22, 2020, and for a declaration that Purchaser did not have the right to terminate the SPA and that Seller was entitled to the $1,500,000 held in escrow.

¶ 27     The parties eventually filed cross-motions for summary judgment. In its motion, Purchaser argued that "Seller was not entitled to a further extension" of the closing date because Seller failed

to satisfy the Estoppel Condition within 30 days, by May 22, 2020. Purchaser also argued that section 8.3 did not permit Seller to extend the closing date for a "known, existing mortgage." Purchaser continued that even if section 8.3 entitled Seller to an extension for a known mortgage, Seller had the ability to provide timely notice of prepayment to Mesa when it gave its First Adjournment Notice and Seller should not benefit from its failure to provide notice of prepayment.

¶ 28 Seller's motion argued that it was entitled to adjourn the May 22, 2020 Closing Date pursuant to sections 4.3 and 8.3 to remove Mesa's mortgage. Additionally, Seller argued that Purchaser's position that Seller was required to provide the tenant estoppel certificates by May 22, 2020 conflicts with sections 35(c), 36.2, and 36.3(b) of the SPA because those sections required the Estoppel Condition to be satisfied by the closing and required the tenant estoppel certificates to be dated no earlier than 30 days before the closing. Seller also contended that, contrary to Purchaser's position, the SPA did not mandate that Seller identify the lien or evidence that it had provided notice of prepayment in its Second Adjournment Notice. Lastly, Seller argued that it did not act in bad faith or "fail to perform" when it sent its Second Adjournment Notice because the parties specifically negotiated Seller's right to adjourn the closing multiple times and Seller adjourned the closing so that it could avoid incurring unnecessary costs from Mesa if the parties failed to close by May 22, 2020.

¶ 29 On summary judgment, the circuit court determined that there was no ambiguity in the SPA which would require it to examine "numerous external factors" raised by the parties in order to determine the meaning and intent of the SPA. The circuit court further noted that Purchaser failed to point to any language in the SPA which prohibited sequential adjournments and the SPA did not require Seller to acquire a release of liens while it was dealing with the tenant estoppel certificates. The circuit court reasoned that Seller was not in default when Purchaser sent its

Termination Notice on May 22, 2020, because the SPA only required Seller to provide the tenant estoppel certificates by the June 22, 2020 Adjourned Closing Date and did not otherwise prohibit Seller from adjourning closing date. Based upon the above reasoning, the circuit court denied Purchaser's motion for summary judgment, granted Seller's motion for summary judgment, and entered judgment in favor of Seller.

¶ 30                                II. ANALYSIS

¶ 31         On appeal, Purchaser primarily argues that the circuit court erred in granting summary judgment in favor of Seller because Seller breached the SPA when it failed to deliver the tenant estoppel certificates by the May 22, 2020 Adjourned Closing Date. Specifically, Purchaser contends that under section 36.2, the certificates had to be delivered by May 22, 2020, notwithstanding the Seller's subsequent adjournment of the closing date. In a second argument, Purchaser contends that Seller violated its duty of good faith and fair dealing because it failed to provide timely notice of prepayment of the mortgage to Mesa so that it could secure more than 30 days to satisfy the Estoppel Condition.

¶ 32         Seller responds that it did not breach the SPA because the SPA granted Seller the right to adjourn the closing date multiple times, such that the tenant estoppel certificates were not required to be delivered until the June 22, 2020 Adjourned Closing Date. Seller also contends that Purchaser's argument that Seller was required to produce the tenant estoppel certificates by May 22, 2020, conflicts with section 36.3(b) of the SPA because the tenant estoppel certificates would have been dated earlier than thirty days prior to the June 22, 2020 Adjourned Closing Date. Lastly, Seller argues that Purchaser waived its bad faith argument by failing to raise it before the circuit court and, in the alternative, even if Purchaser properly raised the argument, the argument is not

supported by the record. For the following reasons, we conclude that the trial court erred in granting summary judgment in favor of Seller.

¶ 33    Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2–1005© (West 2004). In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Bagent v. Blessing Care Corp.*, 224 Ill. 2d 154, 162-63 (Ill. 2007). When parties file cross-motions for summary judgment, they agree that only a question of law is involved and invite the court to decide the issues based on the record.[2] *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. "However, the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Id.*  In appeals from summary judgment rulings, review is *de novo*. *Bagent*, 224 Ill. 2d at 162-63.

¶ 34    In construing a contract, the primary objective is to give effect to the intention of the parties. *Gallagher v. Lenart*, 226 Ill. 2d 208, 232-33 (2007). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id.* Intent of the parties is not to be gathered from detached portions of the contract or from any clause or provision in isolation. *Id.* "[A] contract must be construed as a whole, viewing each part in light of the others." *Id.* "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the

---

[2] While Purchaser and Seller filed separate motions for summary judgment, the circuit court construed the motions as cross-motions for summary judgment on the basis that the parties agreed on the facts and were only disputing the language of the contract.

plain and obvious meaning of the language used." *Insurance Benefit Group, Inc. v. Guarantee Trust Life Insurance Co.*, 2017 IL App (1st) 1620808, ¶ 38.

¶ 35 However, if the language is susceptible to more than one reasonable interpretation, it is ambiguous. *Gallagher*, 226 Ill. 2d at 232-33; *Storino, Ramello & Durkin v. Rackow*, 2015 IL App (1st) 142961, ¶ 18 (citing *Nicor, Inc. v. Associated Electric & Gas Ins. Servs. Ltd.*, 223 Ill. 2d 407, 417 (2006)). If the contract language is ambiguous, a court may consider extrinsic evidence to determine the parties' intent. But "[a] contract is not rendered ambiguous merely because the parties disagree on its meaning." *Central Illinois Light Co. v. Home Ins. Co.*, 213 Ill. 2d 141, 153 (2004).

¶ 36 A. Contract Interpretation of Section 36.2

¶ 37 Neither Purchaser nor Seller argues that the contract language is ambiguous, rather the parties merely disagree as to its meaning. Purchaser believes that section 36.2 mandated Seller to deliver the tenant estoppel certificates by May 22, 2020, the first Seller Adjourned Closing Date, regardless of Seller's subsequent adjournment of the closing date. Specifically, Purchaser focuses on the language within section 36.2 which granted the Seller the right to "adjourn the Closing Date one or more times (but *for not more than thirty (30) days in the aggregate) in order to satisfy the Estoppel Condition . . .*" (emphasis added). The provision included an express and definitive time limit on the extension of the closing date for the purpose of Seller's satisfaction of the Estoppel Condition, a condition precedent to closing. Purchaser argues that this language required Seller to produce the tenant estoppel certificates by May 22, 2020, even if the closing date was extended beyond that date pursuant to another section explicitly identified by section 4.3. Further, Purchaser argues that allowing Seller to delay production of the tenant estoppel certificates until a future Seller Adjourned Closing Date is contrary to the purpose and intention of section 36.2. Purchaser

contends that Seller's interpretation would allow Seller more than 30 days to satisfy the Estoppel Condition and would render the language which limits adjournment of the closing date null.

¶ 38       On the other hand, Seller argues that, pursuant to other provisions of the SPA, which should be construed together, the trial court correctly determined that the tenant estoppel certificates were not due until the June 22, 2020 Adjourned Closing. Seller points out that the contrast between Seller's adjournment right "to adjourn the Closing one or more times" as compared to Purchaser's "one-time right" shows a clear intent to permit Seller multiple, successive adjournments. Additionally, Seller points out that section 36.2 required the tenant estoppel certificates to be produced "at Closing" and only triggered Purchaser's termination right if the Estoppel Condition was not satisfied "on or before Closing." Seller also claims that requiring it to produce the tenant estoppel certificates by May 22, 2020 would render section 36.3(b) meaningless because the tenant estoppel certificates would be dated earlier than 30 days prior to the closing date.

¶ 39       Bearing in mind we should not read provisions of the contract in isolation or in a way that would render other provisions meaningless, we agree with Seller and the circuit court's interpretation of the SPA. Section 4.3 clearly and unambiguously granted Seller the right to adjourn the Closing *one or more times* for the *reasons* explicitly set forth in section 4.3 and *for the time period specified* by each section set forth in 4.3. (emphasis added). Of these explicitly set forth reasons, sections 8 and 36 were identified as bases by which Seller may adjourn the closing. Section 4.4 clearly defined the closing date as *any* Seller Adjourned Closing Date. (emphasis added). Thus, if Seller adjourned the closing pursuant to section 4.3 and an accompanying section, the Seller Adjourned Closing Date would become the effective closing date referenced throughout and read into the SPA.

¶ 40       The parties' intention to permit Seller multiple, successive adjournments is further evidenced when contrasting the language used to grant each party its adjournment rights. Unlike the "one-time right" granted to Purchaser, Seller was granted "one or more times" to adjourn the closing date. In addition, rather than defining the closing date as "any" adjourned closing date, as the parties had for Seller, the SPA defined closing date as including "*the* Purchaser Adjourned Closing Date." (emphasis added). It is clear that the parties understood how to draft the contract such that no successive adjournments would be permitted, but instead used explicit language which granted Seller the right to successive adjournments and evidence the parties' intention to do so.

¶ 41       Purchaser focuses its attention on the language within section 36.2 which stated "Seller shall have the right to adjourn the Closing Date . . . but for not more than 30 days . . . in order to satisfy the Estoppel Condition . . ." Purchaser suggests we should read this provision in isolation so that it stands for the proposition that the Estoppel Condition must be satisfied by the end of that specific 30-day Seller adjournment period, regardless of whether Seller subsequently adjourned the closing date pursuant to other terms of the contract. The effect of this reading is that Purchaser ignores the remainder of section 36.2 which more specifically provided when Seller must perform its obligations under this section.

¶ 42       Other language in section 36.2 provided that Seller was required to deliver the tenant estoppel certificates "at Closing" and that Purchaser was only permitted to terminate the SPA if Seller failed to "satisfy the Estoppel Condition *on or before* the Closing . . ." (emphasis added). This language is consistent with the parties' intent for Seller to perform and satisfy the Estoppel Condition by the closing (including any Seller Adjourned Closing Date pursuant to section 4.3), rather than by the end of any section 36.2 adjournment period. Purchaser conflates the adjournment period of section 36.2 with the time that performance of the Estoppel Condition was due. These

are not the same. While the closing date may be adjourned for 30 days pursuant to section 36.2, performance of the Estoppel Condition was not due until the actual closing of the transaction.

¶ 43 Moreover, while Purchaser focuses on the language in section 36.2 which limited adjournment to no more than 30 days *for the purpose of satisfying* the Estoppel Condition, it is clear that this language did not limit Seller's right under section 4.3 to adjourn the closing date "one or more times" pursuant to other sections in the SPA. Sections 8, 11, 35, and 47 are listed as additional reasons which would permit Seller to further adjourn the closing date beyond the 30 day extension permitted for the Estoppel Condition. Each of these sections allow Seller to extend the closing date for up to 30 days in the aggregate in order to cure defects in its performance or to perform obligations under that specific section.

¶ 44 For example, section 8.3, which required Seller to remove any exceptions or encumbrances to the title, granted Seller the right to adjourn the closing date for up to 30 days in the aggregate "in order to effectuate its obligation hereunder." Similarly, section 11.3(c), which prohibited Seller from making any false, material representations, granted Seller the right to adjourn the closing date for up to 30 days in the aggregate "to effectuate such cure [of any untrue representation] . . ." Sections 35(d) and 35(f), which required the Delivery Date under the LA Fitness lease to have occurred and required Seller to provide subordination non-disturbance and attornment agreements from each tenant, granted Seller the right to adjourn the closing date for up to 30 days in the aggregate "for purposes of allowing [these] condition to met . . ." Finally, section 47, which required Seller to deliver bulk sales notification applications, granted Seller the right to adjourn the closing date for up to 30 days in the aggregate "in order to comply with the above stated time frames." It is clear that the parties worded these provisions in a way which gave additional time

for the performance of *each specific section* and did so because they intended to grant Seller multiple, successive adjournments.

¶ 45　　　Section 36.3(b) further evidences the parties' intent that the time to satisfy the Estoppel Condition is governed by the actual closing (including any Seller Adjourned Closing Date). Section 36.3(b) stated that the tenant estoppel certificates shall "be dated not earlier than thirty (30) days prior to the Closing Date . . ." This language clearly and unambiguously expressed the intent for the Seller to satisfy the Estoppel Condition and produce the tenant estoppel certificates within thirty days of the closing date, including any Seller Adjourned Closing Date.

¶ 46　　　Further, Purchaser's reading of the contract to require delivery of the certificates within 30 days of the closing date would lead to a result that undermines and renders section 36.3(b) meaningless. Section 42 dictated that if performance of any obligation under the SPA would fall on a day other than a business day, such performance shall be "automatically adjourned to the first (1st) Business Day immediately succeeding the day on which such obligation would otherwise be required to be performed." When Seller adjourned the closing for a second time pursuant to section 8.3, the 30-day adjournment fell outside of a business day, on a Sunday. As such, the closing date and performance of any obligations tied to closing were *automatically* adjourned to the following business day, 31 days after May 22, 2020. Under these circumstances, had Seller been required to deliver the tenant estoppel certificates and satisfy the Estoppel Condition by May 22, 2020, the tenant estoppel certificates would have been stale and ineffective by the June 22, 2020 Adjourned Closing Date as that closing date fell 31 days after May 22, 2020. Purchaser's reading of the SPA would, therefore, impermissibly render section 36.3(b) meaningless and null.

¶ 47    For the foregoing reasons, the trial court did not err in determining that the SPA permitted multiple, sequential adjournments of the closing date or that the Estoppel Condition was required to be satisfied on or before the closing.

¶ 48                    B. Duty of Good Faith and Fair Dealing

¶ 49    Notwithstanding that the SPA clearly and unambiguously granted Seller the right to multiple, successive adjournments and allowed performance of the Estoppel Condition on or before the closing date, including any Seller Adjourned Closing Date, Purchaser argues that Seller violated its duty of good faith and fair dealing when it sought to adjourn the closing date pursuant to section 8.3. Purchaser claims that Seller purposefully failed to provide notice of prepayment of the mortgage to Mesa so that Seller could secure additional time to satisfy the Estoppel Condition beyond the 30 day adjournment period allowed under section 36.2.

¶ 50                1. Waiver of Duty of Good Faith and Fair Dealing

¶ 51    Initially, we must address Seller's claim that Purchaser waived its bad faith argument because Purchaser failed to raise it before the circuit court. "It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal." *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 453 (1st Dist. 2007) (quoting *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996)). The "purpose of the waiver doctrine is to prevent unfair prejudice to an opposing party: If one party neglects to raise an argument at the trial level, the adversary may be forestalled from presenting evidence in rebuttal, and thus it is proper to bar the first party from springing the argument at the appellate level where the presentation of evidence is no longer possible." *Cambridge Engineering*, 378 Ill. App. 3d at 453.

¶ 52     From our review of the record, it is evident that, while the parties seldom raised the issue of Seller's bad faith before the circuit court, both parties were aware of and addressed the issue in the pleadings and the briefing on cross-motions for summary judgment. Purchaser first raised the issue in paragraphs 33 through 35 of its complaint. In its motion for summary judgment, Purchaser argued that Seller attempted to gain an advantage from its own failure to comply with its contractual obligations and cited a federal case analyzing the duty of good faith and fair dealing, *Sain v. Nagel*, 997 F.Supp. 1002, 1011 (N.D. Ill. 1998). Purchaser again raised the issue in its reply brief on its motion for summary judgment. While Seller argues that it would be prejudiced by Purchaser's attempt to raise the issue of bad faith on appeal, Seller itself acknowledged and presented rebuttal evidence on the issue of bad faith in its own motion for summary judgment. Thus, neither party was forestalled or prejudiced in presenting evidence in support of or to rebut Purchaser's argument of bad faith. Therefore, we reject Seller's contention that Purchaser waived its bad faith argument.

¶ 53     2. Seller's Violation of the Duty of Good Faith and Fair Dealing

¶ 54     "In Illinois, as in the majority of American jurisdictions, the covenant of good faith and fair dealing is implied in every contract absent express disavowal." *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 989-90 (1st Dist. 1984) (citing *Martindell v. Lake Shore Nat. Bank*, 15 Ill. 2d 272, 286 (1958)). While not an independent source of duties for the parties to a contract or cause of action, the covenant of good faith guides the construction of explicit terms in the agreement. *Dayan*, 125 Ill. App. 3d at 991 ("[I]mproper motive has no separate doctrinal basis apart from the implied covenant of good faith performance. Where a party acts with improper motive, be it a desire to extricate himself from a contractual obligation by refusing to bring about a condition precedent or a desire to deprive an employee of reasonably anticipated benefits through

termination, that party is exercising contractual discretion in a manner inconsistent with the reasonable expectations of the parties and therefore is acting in bad faith.").

¶ 55    The covenant of good faith and fair dealing is triggered when a party is vested with broad contractual discretion to perform its obligations under the contract. *Id.* at 990-91. This is because the dependent party must rely on the party in control to exercise its discretion fairly. *Id.* When a party is given such discretion, it "must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Id.* The covenant prevents the controlling party from avoiding incurring a contractual obligation by refusing to bring about the relevant condition precedent. *Id.*

¶ 56    When Seller provided its Second Adjournment Notice to Purchaser on May 20, 2020, Seller purported to adjourn the closing date because it had not cleared all encumbrances from the title pursuant to section 8.3. The reason the title was not clear was because Seller had not provided notice of prepayment of the mortgage to Mesa. Written notice of prepayment of the mortgage was required to be delivered no less than 15 days but no more than 60 days prior.

¶ 57    In this appeal, Purchaser argues that Seller was not entitled to adjourn the closing date for a second time pursuant to section 8.3 because Seller violated its duty of good faith and fair dealing. Despite Seller being able to, Purchaser claims that the Second Adjournment Notice was impermissible because Seller intentionally failed to timely provide notice of prepayment of the mortgage to Mesa. Purchaser claims that Seller failed to do so in order to extend the closing date and avoid its obligations to deliver the tenant estoppel certificates. Additionally, Purchaser contends that Seller's failure to satisfy the Estoppel Condition by May 22, 2020 demonstrates its bad faith. Purchaser points to the SPA's Time is of the Essence Clause to argue that the failure to produce the tenant estoppel certificates by May 22, 2020, and attempted extension of the closing

date was bad faith. Purchaser outlines the issues Seller dealt with from March 16, 2020 to March 24, 2020 in satisfying the Estoppel Condition and delivering the tenant estoppel certificates, including Seller's inability to agree on a Delivery Date with LA Fitness, Seller owing $2,415,000 to Floor & Décor, and Seller's failure to perform maintenance for Olive Garden. *See* C317-20. Purchaser claims those facts evidence Seller's bad faith and attempts to "hid[e] the true state of affairs" of the tenant estoppel certificates from Purchaser. Ultimately, Purchaser claims this led to Seller's Second Adjournment Notice and communications which stated that the reason Seller had not provided notice of prepayment to Mesa was because it had not obtained the estoppel certificates.

¶ 58    In response, Seller argues that Purchaser's "bad faith" arguments are not supported by the undisputed facts in the record or the clear and unambiguous language in the contract. Seller argues that Purchaser's argument that Seller *could have* provided timely notice of prepayment prior to the May 22, 2020 Closing Date is misplaced and unsupported by the record. Specifically, Seller claims that Purchaser was searching for financing after its lender placed a hold on mortgage-backed commercial loans and this factored into Seller's decision to wait to provide notice of prepayment of the mortgage to Mesa. Seller argues that its decision to wait to provide notice of prepayment was based upon its reasonable belief that the parties might not close by the May 22, 2020 Closing Date and its desire to avoid additional fees that would be incurred for any failure to timely close after the notice of prepayment. Seller also focuses on the clear and unambiguous language of the SPA. Seller argues that the Time is of the Essence Clause cannot be used to contravene the Seller's adjournment rights or the express definition of the "Closing Date" as set forth under the SPA.

¶ 59    The Time is of the Essence Clause in section 4.4 provided an express agreement by both parties that:

"It is expressly agreed by Seller and Purchaser that time is of the essence with respect to Seller's and purchaser's obligation to close this transaction on the Closing Date. For the avoidance of doubt, the parties acknowledge[] that if Seller or Purchaser, as applicable, adjourns the Closing Date pursuant to any right of adjournment expressly granted hereunder, then time shall be of the essence with respect to Seller's and Purchaser's obligation to close this transaction on such adjourned Closing Date, subject to any expressly provided notice and cure rights herein. As used herein, the term 'Closing Date' shall mean the Initial Scheduled Closing Date, or, if the Closing is adjourned, any Seller Adjourned Closing Date, or the Purchaser Adjourned Closing Date."

¶ 60        While section 4.4 provided that Seller was under a time-is-of-the-essence duty to close, the Time is of the Essence Clause did not abrogate Seller's right to adjourn the closing date "one or more times." In fact, the Time is of the Essence Clause not only acknowledged Seller right to multiple, successive adjournments of the closing date but also defined the closing date as "*any* Seller Adjourned Closing Date." It is clear that the parties contemplated the potential for multiple Seller Adjourned Closing Dates specifically when drafting the Time is of the Essence Clause. Additionally, as discussed at length above, Seller was permitted multiple, successive adjournments under section 4.3. Thus, Purchaser cannot claim that the Time is of the Essence Clause created a reasonable expectation that Seller would produce the tenant estoppel certificates prior to closing. Nor, as addressed by the circuit court in its summary judgment order, can Purchaser claim that the

Time is of the Essence Clause created a reasonable expectation that Seller would acquire a release of the liens during the section 36.2 (Estoppel Condition) adjournment period.

¶ 61                                    III. CONCLUSION

¶ 62        For the reasons stated, we affirm the judgment of the circuit court denying the plaintiff's motion for summary judgment, granting the defendant's motion for summary judgment, and entering judgment in favor of the defendant.

¶ 63        Affirmed.